# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-CA-00728-SCT

**WHITNEY BANK f/k/a HANCOCK BANK, A
MISSISSIPPI STATE CHARTERED BANK d/b/a
HANCOCK BANK**

*v.*

**TRIANGLE CONSTRUCTION COMPANY, INC.**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/28/2016 |
| TRIAL JUDGE: | HON. SANFORD R. STECKLER |
| TRIAL COURT ATTORNEYS: | DEREK ANDREW HENDERSON |
| | JEFFREY MONROE WILLIAMS |
| | MACY DERALD HANSON |
| | MICHAEL SHELTON SMITH, II |
| | D. RONALD MUSGROVE |
| | JEFFREY MATTHEW GRAVES |
| | CHAD MICHAEL KNIGHT |
| | JOHN G. CORLEW |
| | JOY LAMBERT PHILLIPS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DEREK ANDREW HENDERSON |
| ATTORNEYS FOR APPELLEE: | D. RONALD MUSGROVE |
| | MICHAEL SHELTON SMITH, II |
| | MACY DERALD HANSON |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 10/05/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KING, JUSTICE, FOR THE COURT:**

¶1. In this lien priority case, a property owner defaulted on his obligations, and the

construction lender foreclosed the property. The general contractor had a materialman's lien

on the property. At the foreclosure sale, the purchase price for the property was significantly lower than the total amounts owed. The sole issue before the chancery court was which lien had priority – that of the construction lender, or that of the contractor. The chancery court found that the contractor's lien had priority. Because the chancery court did not abuse its discretion, this Court affirms.

## FACTS AND PROCEDURAL HISTORY[1]

¶2.    Knight Properties purchased a piece of property on which it planned to build a residential development. In February 2007, Hancock Bank issued a line of credit[2] to Knight Properties in the amount of $2.25 million. In gathering information to approve the loan, Hancock obtained the contract between Knight Properties and Triangle Construction Company, Inc., entered into on February 12, 2007, for Triangle to be the contractor on the project. Before approving the loan, Hancock checked Triangle's contractor's license to ensure it possessed a valid one. Hancock and Knight executed a promissory note and a deed of trust on the property. Later in 2007, Knight conveyed the property to Reunion of Biloxi Development LLC, a conveyance that was essentially a name change. Reunion assumed Knight's debt to Hancock and a new promissory note in the amount of approximately $1.9 million was signed.

---

[1]During the time at issue in this case, Chad Knight, the owner of Knight Properties, transferred ownership of the property to Reunion of Biloxi Development, LLC, which was also owned by Chad Knight. After the events at issue, the lender, Hancock Bank, changed to Whitney Bank. This opinion will refer to the entities as Reunion and Hancock, as those are the names on the documents at issue.

[2]The promissory note simply describes the loan as a line of credit, and does not specify that it is a construction loan.

¶3. The first draw on the loan was made on February 19, 2007, in the amount of $966, 872.71, and was used to pay off the balance of the existing purchase loan on the land. Hancock Bank had financed the original purchase of the property, so it used the line of credit to pay off the existing balance to itself. The remaining draws occurred sporadically through May 11, 2009, with Hancock distributing a total of nine draws, in the total amount of $1,704,660.42. For each distribution, Hancock's attorney, George Murphy, checked the chancery court for liens on the property and obtained an owner and/or contractor affidavit from Chad Knight. The affidavit attested that all subcontractors, materialmen, and other such laborers had been paid in full any amounts owed. The affidavit also had the contractor waive any claim to a lien and affirmed that "[t]he owner has no interest or ownership in the contracting firm or firms and the contractor has no interest in the real property described above[.]" Chad Knight then signed each affidavit twice for Reunion, as both the owner and the contractor. Murphy testified that Hancock had not informed him that Triangle was the contractor, and that information would have changed the way he did things in that he "certainly" would have had the contractor sign the affidavit. Hancock asserted that the information that Triangle was the contractor was sent to Murphy at some point via fax. Hancock also had the site inspected by an engineer to ensure that the progress matched the requested disbursement amount.

¶4. On March 31, 2008, Reunion and Triangle entered into a contract for Triangle to be the contractor on the project.[3] It provided that Triangle "agrees to furnish all materials and

---

[3]Hancock argues that Reunion was the general contractor and Triangle was a subcontractor. Ample evidence in the record disputes this, such as the contract between

3

perform all work necessary to complete Reunion Place Subdivision . . . . The scope of work to achieve completion is further described as Site Improvements, Water Improvements, Sewer Improvements, Storm Drainage Improvements. The project will be constructed based on the plans drawn by [the engineer.]" It also provided that all subcontracts were subject to the approval of both the owner and the engineer. The contract stated that the contractor would submit an invoice to the owner and the engineer on the twenty-fifth of every month and that the invoice was payable by the tenth of the following month. It provided that work on the project would cease if the invoice was not paid in full by the fifteenth of the following month. Work commenced on the project. Financial problems then arose for Chad Knight. Some time around October 2008, Triangle pulled off the work site for nonpayment, but it eventually returned.

¶5.      In December 2008, Henry Knue and Donna Smith, Hancock Bank employees assigned to the Reunion loan, had a conversation about Triangle. Knue emailed Chad Knight with a subject line "Draw Pending - Triangle Construction" and stated "Please email or fax invoice due Triangle construction so that I may accurately instruct attorney for disbursement." Chad Knight replied that he was faxing the invoice, "However, I'm not sure what you mean

Reunion and Triangle indicating that Triangle was the general contractor; statements in emails by Hancock indicating that Triangle was "the" contractor; Chad Knight's deposition testimony that Triangle was the general contractor on the project; communications between Triangle and Reunion regarding Triangle, and not Reunion, paying subcontractors; and communications between Chad Knight and Hancock indicating that Triangle had the responsibility to pay subcontractors. The chancery court specifically found that Triangle was the general contractor on the project, and under an abuse of discretion standard, we cannot find that the chancery court erred in making this factual finding, given the abundance of evidence indicating that Triangle was the general contractor.

regarding the disbursement instructions to the attorney. The draw needs to be disbursed to Reunion Development as all draws have been. We will pay our contractors and vendors." Knue forwarded this to Smith as an "fyi," and Smith responded that "All of our attorney letters that support the disbursement instruct the attorney to disburse any outstanding invoices, etc. that may be out there. I know he is aware of this." Knue replied that the fax he had received from Knight was not a Triangle invoice, but a Reunion invoice. He stated that he "delivered the check so as not to delay the draw given the urgency in posting before end of day on Wednesday. Attorney has historically disbursed to them and executing an affidavit stating no outstanding invoices. Maybe we can address this in Tuesday's meeting with them as well?" Smith replied that "I think that is fine . . . . As long as there are no liens outstanding to Triangle and they are continuing to do the work, then we should be fine. But be sure that your instructions letter to the attorney states that any outstanding liens are paid for."

¶6. On April 27, 2009, Chad Knight emailed Smith with a draw request, and stated "FYI, we plan to send payment from this draw and our funds directly to the subcontractor (Warren Paving), as our last payment to the Triangle construction apparently did not end reach the sub. We've taken steps to protect against this happening again."[4] On April 28, 2009, Carla Roy from Hancock emailed George Murphy's paralegal and asked her to update Reunion's title in anticipation of a "progress draw." On May 5, 2009, the paralegal informed Roy that

[4]Regardless of the veracity of Chad Knight's statement, he certainly put Hancock on notice that he had outstanding, unpaid invoices to contractors and/or materialmen. And it appears that he acknowledged to Hancock Bank that Triangle was the contractor.

5

the update was complete. Roy responded "Great, I will schedule the draw with you as soon as we have everything in place on our end. Thanks for the update." Smith, who was copied on this email chain, then emailed Roy, stating "I have a call into Chad to discuss the draw amount, no work on the property since the contractor called and stated he pulled off the property and also the Erosion issues that I inspected this morning!! I will let you know when I hear from him!!" Smith described her inspection of the property, noting that "the roads like caving in and it look [sic] delapidated [sic] basically, like nothing had been going on for several weeks. There was no movement on the property." Yet Hancock distributed a draw to Reunion on May 9, 2009. Additionally, during the majority of this time period, Hancock was aware that Reunion was having financial difficulties. One Hancock document noted that "[t[here have been some issues with the contractor on the job and payment issues with him being paid which both sides state are being taken care of however, this has caused the contractor to pull off the job site for more than 8 weeks now and no work has been complted [sic]."

¶7. Triangle filed a construction and materialmen's lien on the property on December 16, 2009, in the amount of $214,314.18. After Reunion defaulted on the construction loan, Hancock filed a complaint against Chad Knight, Reunion, and Triangle, among others, and also moved for foreclosure. The chancery court authorized Hancock to foreclose on the property. A third party purchased the property at the foreclosure sale for $800,000. Triangle filed a counterclaim against Hancock for the $214,314.18 it was owed. Hancock filed a motion for summary judgment as to Triangle, which the chancery court denied.

6

¶8.     After a bench trial on the matter,[5] the chancery court found that Triangle's lien had priority over Hancock's claims.  The chancery court specifically found that Triangle was the general contractor on the project and that Hancock failed to use reasonable diligence in disbursing the construction loan.  It thus ruled that Triangle's lien had priority over Hancock's deed of trust, and that Triangle must be paid first out of the foreclosure proceeds.  The chancery court awarded Triangle attorneys' fees in the amount of $106,350.48 and awarded Triangle pre- and post-judgment interest at the rate of eight percent.  Hancock appeals, arguing that 1) the chancery court erred in its determination that the loan funds did not go into the project because the first portion of the loan funds went to pay off an existing loan on the property; 2) the chancery court erred by determining that Hancock did not use reasonable diligence in disbursing the loan; 3) the chancery court erred in awarding Triangle pre- and post-judgment interest at the rate of eight percent; and 4) the chancery court erred in awarding Triangle attorney's fees and expenses.

## ANALYSIS

### 1. Standard of Review

¶9.     "Findings of fact made by a chancellor may not be disturbed or set aside on appeal unless manifestly wrong." **Cotton v. McConnell**, 435 So. 2d 683, 685 (Miss. 1983).  "This is so whether the facts found be characterized as ultimate facts or as mere evidentiary facts." **Id.**  This Court "must consider the evidence in the light most favorable to the party in whose

---

[5]Several of the witnesses to the transactions testified, as well as both sides' experts, who testified as to whether Hancock's actions were against or compliant with banking standards regarding reasonable diligence.

7

favor the fact findings were made. [This Court] must also give that party the benefit of all reasonable inferences which may be drawn from the evidence. If when [this Court does] this [it] find[s] that there is substantial evidence which supports the finding of fact made by the chancellor, [it] must affirm." *Peoples Bank & Trust Co. and Bank of Miss. v. L & T Developers, Inc.*, 434 So. 2d 699, 704-05 (Miss. 1983). Furthermore, this Court must "assume that the chancellor resolved in favor of appellees all conflicts in the evidence on fact issues with respect to which the chancellor made no findings of fact." *Id.* at 705. Thus, this Court employs an abuse of discretion standard for review of a chancellor's decisions. *McNeil v. Hester*, 753 So. 2d 1057, 1063 (Miss. 2000). Questions of law, however, are reviewed de novo. *Id.*

### 2. Lien Law

¶10.    "The lien of a deed of trust securing a construction loan has priority over mechanics' and materialmen's liens only to the extent that[:] (a) the funds disbursed actually went into the construction, or (b) to the extent that the construction lender used reasonable diligence in disbursing the construction loan." *Guaranty Mortg. Co. of Nashville v. Seitz*, 367 So. 2d 438, 441 (Miss. 1979). Thus, to the extent Hancock can show that its funds actually went into the construction or that it used reasonable diligence in disbursing the loan, its lien holds priority over Triangle's lien.

### 3. Whether the funds went into the construction.

¶11.    Hancock argues that because the first disbursement went to pay off itself for the existing loan on the land, those funds actually went into the construction, because

construction is impossible without the land, a so-called "purchase-money" rule within the construction funds test. The chancellor rejected this argument. Triangle argues that money advanced to purchase undeveloped land is clearly not money that went into the construction project.

¶12.    This Court has noted that "'[a] lender advancing construction funds must use reasonable diligence to see that these funds are actually used in payment for *materials or other cost of construction*. Such a construction mortgagee has preference over materialmen and laborers only to the extent that its funds actually go into the construction.'" ***Deposit Guaranty Nat'l Bank v. E.Q. Smith Plumbing & Heating, Inc.***, 392 So. 2d 208, 211 (Miss. 1980) (emphasis added) (quoting ***Wortman & Mann, Inc. v. Frierson Bldg. Supply Co.***, 184 So. 2d 857 (Miss. 1966)). The intent is clearly that where a *construction* lender has actually contributed to the *construction*, such as materials or labor, (or used reasonable diligence to ensure that it is actually contributing to the *construction*), then its lien takes priority over other parties who have contributed to the *construction*. *See* ***Peoples Bank***, 434 So. 2d at 707. What is less clear is whether the purchase price of property is a cost of construction. We recognize that some of our cases have, without discussion, separated the purchase money price and the costs of construction, while others have, without discussion, combined the two. *See* ***Wortmann & Mann***, 184 So. 2d at 858 (purchase price of land advanced by construction lender not included in costs of construction); ***Deposit Guaranty***, 392 So. 2d at 209-10 (purchase price of land included in amount that received priority as a construction loan). The dissent correctly notes that in ***Wortmann & Mann***, "this language is merely a recapitulation

9

of the testimony given at the trial court level.  In its analysis, the opinion does not set forth how the purchase money should have been treated."  Dis. Op. at ¶ 31.  Yet, the dissent inexplicably treats the same recapitulation of trial testimony in the *Deposit Guaranty* and *Virden* cases as "dispositive" and "on point."  Dis. Op. at ¶ 27.  The entirety of the language in *Virden* was that the trial court "declared a first lien on these funds in favor of the Bank for $7,315.76," that "[o]nly $7,315.76 of the money advanced by the Bank actually went into the purchase of the lots and the construction of the houses," and that "only $7,315.76 of its money actually went into the project." *Virden*, 45 So. 2d at 270.  In its analysis, the opinion does not discuss how the purchase money should have been treated, as this particular finding was not challenged, and the Court merely affirms those findings.     *P e o p l e s   B a n k*, however, provides more clarity and discussion on this issue.  L&T Developers, Inc., financed Bruce Homes, Inc.'s purchase of three tracts of undeveloped land.  *Peoples Bank*, 434 So. 2d at 703.  Bruce Homes was a speculative builder and planned to build a residence on each of the three tracts.  *Id.*   After L&T financed the purchase, Bruce Homes obtained three secured construction loans from two different banks.  *Id.*  Materialmen then provided goods and services to the project.  *Id.* at 704.  Bruce Homes then defaulted on all its obligations and the properties were foreclosed.  *Id.*  The liens of L&T, the materialmen, and the construction lenders were all valid, so the issue was priority among the valid liens.  *Id.* at 714.

¶13.    As to the priority of construction lender versus materialmen, the Court noted the principle that the equities favor the materialmen.  *Id.* at 705.

> A materialman, a mechanic or other similar parties . . . typically furnishes supplies, materials or services which are indispensible to the

10

successful prosecution of the construction project. That these potential lienors render their services and perform their work, generally on credit, is to everyone's benefit, including the construction lender. For as these parties give value, the value of the construction lender's collateral is enhanced.

If, as here, the materialmen are not paid, quite likely the construction lender will be unjustly enriched at their expense. For in this situation, if the construction lender were allowed a priority over the materialmen, it would have received the enhancement to the value of its collateral while the materialmen, without whose services the bank cannot expect the secured construction loan transaction to succeed, would as a practical matter be without security, and, most likely, with little prospect of getting paid.

We emphasize the ease with which the construction lender may protect itself. Construction lenders may make advances in the form of drafts or checks payable directly to materialmen or payable to materialmen and the builder jointly. Such a practice, of course, would render the present fiasco impossible. Even where such tight controls are not exercised, many construction lenders require affidavits to the effect that all materialmen and potential construction lienors have been paid. Without doubt in this sort of situation the bank/construction lender is in a far better situation than is the materialman to protect itself and police the use of the construction loan funds and thereby avoid the predicament which has in fact ensued.

*Id.* The Court then acknowledged that materialmen generally have constructive notice of the construction lender's deed of trust, which takes priority, but no "further than its equities require," which means that it should not be given priority "except to the extent that the money secured thereby was actually used in paying for the construction of the building." *Id.* at 707 (quoting *First Nat'l Bank of Greenville v. Virden*, 45 So. 2d 268 (1950)).

¶14. The Court then discussed the materialmen's priority versus the seller who financed the purchase of the land, and who knew that the undeveloped land was bought with an aim toward construction. In affirming the trial court's decision that the materialmen's liens had priority over L&T Developers's (as original landowner/seller and the party providing the financing for the land purchase) liens, the Court noted that the materialmen

11

are parties who supplied materials and labor to the improvements on the two lots, thereby enhancing the value of these projects. Through sweat and elbow grease, these two construction lienors in a very real sense created value which previously was not there. The landowner, on the other hand, has made no similar contribution. The landowner had the far greater capacity to protect his interest, and, further, the landowner profits directly from the success of the overall construction project to which the materialmen so materially contribute.

*People's Bank*, 434 So. 2d at 714. The Court did not consider the financing of the property as a version of a "construction loan." It considered it separately; if the bright-line rule was that the purchase price of the land to be used for a construction project automatically consists of "funds going into construction," L&T in this case would have automatically trumped the materialmen's liens, because its loan to purchase the property would have been deemed as a "cost of construction." However, *People's Bank* clearly contemplates that the purchase price of the property is *not* a cost of construction under some circumstances. We decline to decree a bright-line rule as to whether the purchase money for the land is a cost of construction. The dissent advocates that we adopt a bright-line legal rule that the purchase money for the land in a construction loan is automatically a cost of construction. Chancery courts are courts of equity. We find that the better rule is to allow a chancery court to examine the facts and equities of each case and determine whether purchase money for the land can be claimed as a cost of construction that fairly prioritizes a construction lender's lien over those of materialmen.[6] This result is supported by the caselaw that goes in both

---

[6]The dissent claims that this holding will stifle construction loans that include purchase money for land. Yet, as this Court has already noted, allowing errant construction lenders to automatically trump materialmen stifles development, as materialmen are less willing to work on credit, an arrangement that benefits everyone. Allowing a chancery court to perform its duties by finding facts and balancing equities ensures that the proper lien will receive priority under the specific facts of each case.

directions, because, in each case involving purchase money cited by both this opinion and the dissent, this Court affirmed the findings of the trial court, either way. Examining the specific facts of this case under the standard of review, thus assuming that the chancellor resolved all conflicts in the evidence on fact issues with respect to which the chancellor made no findings of fact in favor of Triangle and giving Triangle the benefit of all reasonable inferences, we cannot find reversible error in the failure to credit the $966,000 that Hancock disbursed to pay itself as a cost of construction. Hancock using a generic "line of credit" to pay itself the balance of the original loan is even further removed from the actual construction on the project than L&T Developers' financing the original land purchase in **Peoples Bank**. For this reason, this Court finds that the chancery court did not abuse its discretion when it found that Hancock's lien did not have priority over Triangle's lien.[7]

### 4. Whether Hancock exercised reasonable diligence.

¶15. Hancock argues that it used reasonable diligence in disbursing the construction funds by obtaining an owner/contractor affidavit, checking the chancery court records for liens, and inspecting the property before disbursements. To be sure, Hancock dotted the "i's" and crossed the "t's." Yet, the chancery court rejected this argument because Hancock knew or should have known that materialmen and contractors were not being paid. Hancock may not

---

[7]If a portion of a construction loan for undeveloped land automatically and always trumps materialmen, it would be antithetical to ever give materialmen priority. To be sure, the current statute regarding contractor's liens (which was not in effect at the time Triangle's lien was filed) requires that, to maintain priority, a construction mortgagee must obtain either an affidavit from the owner stating that no work has been done and no materials delivered to the property, or it must obtain "an affidavit or sworn statement from the contractor, or owner if there is no contractor, . . . regarding payment for work, materials or services provided." Miss. Code Ann. § 85-7-405 (Rev. 2011).

13

cloak its actual knowledge of the issues that were occurring by simply doing the "proper" paperwork.[8]

¶16.    First, the affidavits stating that no payments were outstanding were suspect. Chad Knight signed as both owner and contractor, despite averring that the owner and contractor had no financial interest in one another in the same affidavit, and despite the evidence indicating that Chad Knight was not indeed the general contractor,[9] a fact that evidence indicates Hancock knew. Murphy testified that had he known that Triangle was actually the contractor, he would have done things differently. Chad Knight also informed Hancock at one point that Triangle had not paid a subcontractor. In December 2008, Hancock employees had a conversation regarding Triangle's invoices and a disbursement, indicating that Hancock may have known of payment problems, especially when giving Triangle the benefit of all reasonable inferences drawn from the evidence, as this Court's standard of review demands. Moreover, before the May disbursement, Triangle informed Hancock that it was not being paid. Smith inspected the site herself and noted that it appeared as though no work had been done for awhile and noted that "the" contractor had pulled off the project. Viewing

---

[8]Certainly, it would have been more prudent for Triangle to file a lien earlier in this case. However, that does not change the fact that Hancock had knowledge of the issues of nonpayment.

[9]The chancellor noted that "there was not one shred of evidence anywhere that the owner did any contracting. There was some – there was some indication from Compton that he shouldn't, and then there were steps taken to ensure that he didn't. But for him to say that he's the contractor and did zero contracting. It didn't show that he did anything." He noted that "the idea that Mr. – that Chad Knight was the contractor was an absolute fiction from the get-go, and that should never have been allowed. Therefore, there is no affidavit from the contractor that the – that the bills were paid."

14

the evidence in the light most favorable to Triangle, it is not implausible to find that Hancock knew that Triangle was the contractor, knew that Reunion was having difficulty paying contractors and subcontractors, and knowingly allowed Chad Knight to falsely sign affidavits as the contractor. The chancery court did not abuse its discretion in determining that Hancock did not exercise reasonable diligence in disbursing the construction loan funds and thus its lien does not receive priority.

**5. *Whether eight percent interest was appropriate*.**

¶17.    Hancock argues that an interest rate of one percent over prime would be fair in "today's financial world." Triangle argues that Hancock waived this argument by failing to make a contemporaneous objection and, in any event, that the award is fair.

¶18.    The statute providing for interest gives the trial judge wide discretion. Miss. Code Ann. § 75-17-7 (Rev. 2016). The chancellor stated that "[t]here was no dispute expressed as to the [pre-judgment] interest that I would also award." Hancock did not object. The chancellor then awarded post-judgment interest at eight percent and the attorney for Hancock replied "Thank you, sir." Hancock did not object to an eight percent interest rate in chancery court. Therefore, this argument is waived. *See **City of Jackson v. Jordan***, 202 So. 3d 199, 206 (Miss. 2016) ("If a proper contemporaneous objection is not made, an error is waived.").

**6. *Whether the chancery court erred in awarding attorney's fees and expenses in the amount of $106,350.48*.**

¶19.    Hancock argues that the chancery court's award of attorney's fees is unreasonable. It argues that the chancery court did not consider the appropriate factors, but that all it "required as proof was that the former governor lay his bill on the table." Triangle argues

15

that Hancock waived any objection to the award of attorney's fees by failing to make a contemporaneous objection, and in the alternative, argues that the chancery court did not commit manifest error, as the chancellor went through the appropriate factors and found that the fees were reasonable and warranted.

¶20.   While Hancock did not object to the reasonableness of the attorney's fees at the moment the chancellor made the award, it did vociferously object to the reasonableness of the fees at the time Triangle placed the attorney's bill into evidence.  Thus, Hancock preserved this argument for appeal.

¶21.   The chancery court has wide discretion in awarding attorney's fees.  ***Armstrong v. Armstrong***, 618 So. 2d 1278, 1282 (Miss. 1993).  In this case, the chancellor found:

> With respect to the attorney's fees, they're higher than what lawyers on the Coast get, but we are used to seeing lawyers come in here from other places that do get much higher fees.
> I went through the whole first round of casinos failures and junk bonds and all that, and all the – everybody that came down here from anywhere else – they had a lot of lawyers from New York and they charge a whole lot more than you lawyers from Jackson do.
> But I would assume that the – and I would think that the fees are consistent with what could be demanded by Governor Musgrove.  Obviously, by calling him Governor, I know that he was a former Governor of the State of Mississippi, and as such, is able to attract good clients and able to get a lot of business that maybe someone else wouldn't.
> And not just because of that, but because he's done an excellent job of presenting all of this, as has Mr. Henderson.  I would say that the attorney's fees were fair and reasonable and just and should be awarded.
> Now, with our domestic cases we have here, we go through something we call the McKee Factors, which is an explanation of why the attorneys should get those fees.  And among the things that you – that the Court looks at is, what is the normal and reasonable fee for someone of that similar experience in that kind of a case, what is reasonable in the community where that attorney practices, that attorney's particular practice experience, and the complexity of the case, the amount of time they have to spend, you know,

16

working on the case.

> And in this one, I looked at – I guess we're getting close to 200 exhibits. There were a lot of depositions taken and an awful lot of work done to prepare this case so that it could tried [sic] in two days or two and a half days, instead of two weeks. And so I think that you all did an excellent job with that. And so I think that the attorney's fees should be awarded, and they are granted.

The exhibit that the chancellor examined was a six-page, single-spaced itemization of tasks completed regarding this case.[10] The chancellor considered the appropriate factors and did not abuse his discretion in awarding attorney's fees.

## CONCLUSION

¶22.   Because the chancellor did not abuse his discretion in determining that Triangle's lien took priority over Hancock's lien, and because Hancock's loan for the undeveloped land did not go into construction, this Court affirms the judgment of the chancery court. Moreover, Hancock waived its argument that the eight percent interest award was error. The chancery court likewise did not abuse its discretion in its award of attorney's fees.

¶23.   **AFFIRMED.**

**WALLER, C.J., RANDOPLH AND KITCHENS, P.JJ., COLEMAN AND BEAM, JJ., CONCUR. CHAMBERLIN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY MAXWELL, J. ISHEE, J., NOT PARTICIPATING.**

**CHAMBERLIN, JUSTICE, DISSENTING:**

¶24.   Because I believe that the majority opinion goes against good policy and, more importantly, almost seventy years of precedent, I dissent.

---

[10]The chancellor clearly examined the detailed bill, as he did subtract from the award the amount that Triangle expended opposing Hancock's motion for summary judgment, because he determined that the motion was not unreasonable, even though he did deny it.

¶25. As a preliminary matter, our caselaw is clear that the construction lender is entitled to priority over the materialmen in the amount that went into the construction of the project. ***Riley Building Supplies, Inc. v. First Citizens Nat'l Bank***, 510 So. 2d 506, 508 (Miss. 1987); ***Guaranty Mortg. Co. of Nashville v. Seitz***, 367 So. 2d 438, 441-442 (Miss. 1979); ***First Nat'l Bank of Greenville v. Virden***, 45 So. 2d 268 (Miss. 1950). Likewise, to the extent any additional funds disbursed did not go into the construction project, in order to maintain priority, the construction lender must show that it used reasonable diligence to see that the funds were used in construction. ***Peoples Bank and Trust Co., et al. v. L & T Developers, Inc.***, 434 So. 2d 699, 707 (Miss. 1983); ***Deposit Guaranty Nat'l Bank v. E.Q. Smith Plumbing & Heating, Inc.***, 392 So. 2d 208, 212 (Miss. 1980), *decision clarified*, 396 So. 2d 6 (Miss. 1981); ***Seitz***, 367 So. 2d at 441; *see also* Boackle, K.F*., Mississippi Real Estate Foreclosure Law* § 4:14 (2d ed. 2017); Jeffery Jackson et al., 6 *Mississippi Practice Encyclopedia of Mississippi Law* § 51:30 (2017).

¶26. The main issue is whether the amounts used in the first draw to pay off the existing purchase loan on the land constituted funds that went into construction. The answer is yes, as confirmed by cases dating back to 1950. This Court addressed a substantially similar case in ***Virden***. ***Virden***, 45 So. 2d at 268. In ***Virden***, money was borrowed to purchase lots and construct a residence. The Court held that "only $7,315.76 of the money advanced by the Bank actually went into the *purchase of the lots and the construction of the houses*." ***Id.*** at 270 (emphasis added). The trial judge found that the bank had priority for the $7,315.76, and this Court affirmed. ***Id.*** Further, this Court stated in a footnote that the $7,315.76 *actually*

18

went into the project. *Id.*

¶27.    The *Virden* case is on point and dispositive.  Further, other cases have addressed the issue subsequently and confirmed lien priority to include the purchase price of the property. *See Deposit Guaranty*, 392 So. 2d at 208 (Holding that the bank had lien priority, which included the purchase price). However, the majority states that the holdings in *Virden* and *Deposit Guaranty* hold no weight because the treatment of the purchase money is simply a "recapitulation of trial testimony," as in *Wortmann & Mann, Inc. v.  Frierson Building Supply Co.,* 184 So. 2d 857 (Miss.  1966).  Maj. Op. at ¶ 12.  Although the facts are laid out in the recapitulation of trial testimony, both cases have a holding that *speaks on the status of the purchase money*.  The *Virden* Court held that "such mortgagee shall have preference only to the extent that its funds actually went into the construction."   *Virden*, 45 So. 2d at 271. The Court then affirmed the trial court, giving the mortgagee preference for $7,315.76, which included the price of the land.  *Id.*  Similarly, in *Deposit Guaranty*, the Court reversed the trial court. This Court held that the bank had priority, and the liens of the materialmen were extinguished by the foreclosure sale. *Deposit Guar. Nat'l Bank*, 392 So. 2d at  212.  The liens of the materialmen were extinguished because the bank disbursed $42,732 for purchase of the lot and construction, and the foreclosure sale realized only $38,000.  *Id.* at 211, *decision clarified*, 396 So. 2d at 7.  Simply put, there is no Mississippi case that holds otherwise in similar circumstances, where the lender has made a construction loan that includes the purchase of the property that is still outstanding.

¶28.    The logic behind these holdings is clear.  We want banks to make construction loans.

19

The bank, in general, is not going to make a construction loan unless its lien has priority. Therefore, it includes funds to pay off the existing mortgage as a part of the construction loan, thus ensuring its priority. In our case, although the bank was the same, Whitney was able to place its construction loan in a superior position by extinguishing the first mortgage. To hold otherwise would stifle such loans unless the purchase-money mortgage holder is willing to subrogate its priority.

¶29.   The majority cites two cases which are held forth as supporting the proposition that such funds are not funds that went into construction. Alternatively, they state that it is a fact question subject to an abuse-of-discretion analysis that the chancellor got right in our case. I disagree on both counts.

¶30.   The majority cites *Peoples Bank*, 434 So. 2d at 699, to support its position. *Peoples Bank* is simply not on point and is too dissimilar to our case to control. *Peoples Bank* involved a *separate* loan for the purchase of the property that was *not* a part of the construction loans. *Id.* at 703. *Peoples Bank* clearly states that at the time of the construction loans, "the lien of the purchase money deed of trust held by L & T Developers, Inc. was prior in right to the liens of each of the three deeds of trust in favor of the construction lenders." *Id.* The main distinguishing feature in *Peoples Bank* is that, shortly after the construction loans, the purchase-money mortgage holder signed agreements subordinating its lien to that of the construction lenders. *Id.* In other words, the construction loan liens took priority because the purchase-money mortgage holder agreed to be subordinated to the construction loan liens. The Court went on to grant the materialmen

20

priority over the construction lenders and then placed the construction lenders behind the landowner due to breach of a duty owed the landowner. *Id.* at 713. The priority between the materialmen and the landowner was not challenged on appeal. *Id.* at 714. That is simply not our case.

¶31.   The majority, likewise, submits *Wortman*, 184 So. 2d 857 in support. It opines that *Wortman* is an example of a case in which the purchase price was not included as funds that went into construction. It appears that the only language that supports this proposition is in the paragraph that reads:

> The testimony shows that of the total sum advanced by the Loan Company, only $12,011.69 was actually used as payment for labor and materials that went into the construction of the two residences on lots Nos. 49 and 73. This sum does not include the purchase price of the two lots in the sum of $4,300.

*Id.* at 858. However, this language is merely a recapitulation of the testimony given at the trial-court level. In its analysis, the opinion does not set forth how the purchase money should have been treated. *Id.* at 858-61. Holding in favor of the lender, the Court found that there was reasonable diligence and a lack of notice by the materialmen. *Id.* at 860-61. Thus, the case turned on these two issues, and it never addressed the purchase price of the land and whether it was considered part of the construction.

¶32.   The majority also deems the issue to be a finding of fact subject to an abuse-of-discretion standard. The issue of whether funds used to pay off the existing purchase loan on the land constitutes money going into the construction project is a question of law. That is not to say that there will not be circumstances where a fact finding is necessary when there is some question as to the purpose of the loan, whether the money was used to pay off the

existing mortgage, diversion of the money, etc. The majority states that this dissent advocates adoption of "a bright-line legal rule that the purchase money for the land in a construction loan automatically is a cost of construction." Maj. Op. at ¶ 14. Where the issue is a question of law, my dissent merely upholds our precedent on the status of the purchase money. However, as stated above, where there are circumstances in which fact finding is necessary, my dissent does not hinder that in any way. In this case, however, the issue is one of law. All parties agree that the first draw went to pay off the balance of the existing purchase loan on the land, and no evidence has been submitted that this was anything other than the intention of the parties. Therefore, as all parties agreed to the status of the first draw, unlike the Majority states, I dissent to state that this Court should affirm the findings of the trial court but reverse the application of the law to the facts, as was done in ***Deposit Guaranty*** (and in ***Wortmann*** on the issue of reasonable diligence).

¶33.    The amount used to pay off the existing purchase loan on the land constitutes funds that went into construction. The determination of whether the monies used to pay off the balance of the existing purchase loan on the land is dispositive in that it consumes the entire amount obtained at the foreclosure sale. (The payoff was $966, 872.71 and the foreclosure purchase price was $800,000). Therefore, it is not necessary to get to a reasonable-diligence analysis.

¶34.    For these reasons, I dissent.

**MAXWELL, J., JOINS THIS OPINION.**

22